UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| GREENBRIER HOTEL CORPORATION, THE GREENBRIER SPORTING CLUB, INC., GREENBRIER SPORTING CLUB DEVELOPMENT COMPANY, INC., OLD WHITE CHARITIES, INC., and OAKHURST CLUB LLC <br>         Plaintiffs, <br><br> v. <br><br> GOODMAN-GABLE-GOULD/ ADJUSTERS INTERNATIONAL <br>         Defendant. | Case No. **3:19-cv-00623-HEH** <br><br> **COMPLAINT FOR DECLARATORY AND OTHER RELIEF** |

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiffs, Greenbrier Hotel Corporation ("Greenbrier Hotel"), The Greenbrier Sporting Club, Inc. ("Greenbrier Club"), Greenbrier Sporting Club Development Company, Inc. ("Greenbrier Development"), Old White Charities, Inc. ("Old White"), and Oakhurst Club LLC ("Oakhurst"), by counsel, and for their Complaint for Declaratory and other Relief against Defendant, Goodman-Gable-Gould/Adjusters International ("GGG"), respectfully state as follows:

### I. THE PARTIES, JURISDICTION AND VENUE

#### A. The Parties

1. Plaintiff Greenbrier Hotel is a for-profit corporation, organized and existing under the laws of the State of West Virginia.

2. Plaintiff Greenbrier Club is a for-profit corporation, organized and existing under the laws of the State of West Virginia.

3. Plaintiff Greenbrier Development is a for-profit corporation, organized and existing under the laws of the State of Delaware.

4. Plaintiff Old White is a not-for-profit corporation, organized and existing under the laws of the State of West Virginia.

5. Oakhurst is a limited liability company, organized and existing under the laws of the State of West Virginia. Oakhurst has three members: James C. Justice II, a citizen of West Virginia; James C. Justice III, a citizen of Virginia; and Jillean L. Justice, a citizen of West Virginia.

6. Defendant, GGG, is a for-profit corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 3903 Naylors Lane, Baltimore, Maryland 21208. GGG is authorized to do business in Virginia, and its registered agent for service of process in Virginia is C. Thomas Brown, 10621 Jones Street, Suite 101, Fairfax, Virginia 22030.

**B. Jurisdiction And Venue**

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that it is between citizens of different states and in that the amount in controversy exceeds $75,000.

8. This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 2201, *et seq.*, in that it seeks a declaratory judgment.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that Defendant transacts business in Virginia, is a foreign corporation licensed to do business in Virginia, and is party to an Escrow Agreement, the subject funds of which are held in an escrow account in Richmond, Virginia. Jurisdiction is also proper in this Court pursuant to the Virginia

Long-Arm Statute, Virginia Code § 8.01-328.1 in that at all relevant times GGG transacted business in Virginia, and was licensed to do business in Virginia,

## II. FACTUAL BACKGROUND

### A. Plaintiffs' Properties.

10. Plaintiffs, individually or jointly, own certain properties located in White Sulphur Springs, Greenbrier County, West Virginia. Specifically, they own the Greenbrier Hotel and Resort (the "Hotel") and the Greenbrier Sporting Club (the "Club").

11. The Hotel property includes three championship-level courses – the Old White Course, the Meadows Course and the Greenbrier Course – as well as the historic Old Hickory Shafted Oakhurst 9-hole course (the "Old Oakhurst Course"). The Old White Course has been the host of the Greenbrier Classic (the "Tournament"), a PGA Tour event, since 2010.

12. The Club property includes a fourth championship-level course – the Sam Snead Course. At the time of the flood described below, Greenbrier Club was in the process of constructing a sixth course – the New Oakhurst Course. The New Oakhurst Course is to be a mountain course located adjacent to the oldest known country club in America and was designed by four golfing legends – Arnold Palmer, Jack Nicklaus, Gary Player and Lee Trevino. This was the only time all four golfing legends had come together to design and develop a golf course.

13. Along with the New Oakhurst Course, Greenbrier Club and Oakhurst had developed plans for hundreds of luxury home sites both at the Club location and at the Oakhurst location. Oakhurst also had plans for a ski resort (the New Oakhurst Course, the luxury home development at Oakhurst and the ski resort referred to collectively as the "Oakhurst

Development") to attract guests to the Hotel and the Club in the winter months. The ski resort was planned to be open only to those staying at the Hotel and to members of the Club.

14. In 2015, Oakhurst and Greenbrier Club initiated an intense marketing campaign to sell lots at the Club and at the Oakhurst Development. In order to obtain a lot at either site, each purchaser is or was required to pay a one-time initiation fee of $140,000 and is or was responsible for annual dues in the approximate amount of $18,000. These lots, even in light of the related fees, were desirable in large part because of the presence of the Sam Snead Course at the Club property, the planned Oakhurst Course and the planned ski resort.

15. As a special incentive, Oakhurst and Greenbrier Club offered the first forty (40) purchasers of lots a waiver of the initiation fee and a lifetime waiver of the annual dues.

16. The ski resort was scheduled to open in December 2016, and the Club was also actively securing $500,000 founding memberships for the Oakhurst Development. The purchase of lots at the Club and at the Oakhurst Development, the construction of homes on those lots, the ski resort development and the efforts to secure founding memberships all effectively ceased after the flood.

  **A.** **The Thousand-Year Flood.**

17. On June 23, 2016, a thousand-year flood event (the "Flood") devastated the Greenbrier Valley and White Sulphur Springs, West Virginia. Approximately eleven inches of rain fell in the area within a twelve-hour period.

18. Twenty-three fatalities resulted from the Flood, making it one of the deadliest floods in West Virginia history. Flooding in the town of White Sulphur Springs, where the Hotel, the Club and the Oakhurst Development are located, was especially catastrophic.

19. The disaster recovery efforts following the flooding were significant and lasted for several months. Some of the hardest-hit areas were low-lying areas in White Sulphur Springs where many of Plaintiffs' employees live. Homes were swept away, and people were displaced.

20. Plaintiffs employ over 1,600 people who live in and around the devastated communities, and their immediate focus after the Flood was on the well-being of the community. The Hotel opened immediately following the Flood in order to house displaced members of the community free-of-charge. Plaintiffs' primary goal at that time was to get the properties re-opened so that Plaintiffs' employees could get to their jobs and their paychecks. In addition to expending time and energy getting the properties re-opened, the Greenbrier Hotel and members of the Greenbrier Club raised millions of dollars to help the community recover. Plaintiffs are proud of the role they played in the inspiring story of the aftermath of the Flood.

  **B. The Damage To The Hotel.**

21. The Hotel is 240 years old and is an historic and architectural landmark. Located in the Allegheny Mountains of West Virginia, it is a destination resort.

22. The Hotel and surrounding buildings were severely damaged by the excessive rainfall and resulting Flood. By way of representative examples, but by no means limitation:

  a. The casino at the Hotel was partially flooded.

  b. Colonial Hall, which houses a ballroom and conference center, sustained significant roof and structural damage. There is also now a concern that mold has or may appear.

  c. The brand-new chapel was flooded by six feet of water.

  d. The tennis stadium was flooded by twenty-five feet of water.

5

  e.  The golf academy was completely destroyed.

  f.  The golf equipment buildings were devastated.

  g.  Roof breaks in the hotel caused water and other damage to guest rooms, hallways and furniture.

23. In addition to the physical damage, the Hotel also suffered economic damage from the loss of hotel guest stay revenue, revenue from the operation of the Greenbrier, Meadows, Old Oakhurst and Old White Courses, revenue associated with the cancellation of the Tournament in 2016 and, as described below, the resulting punitive decision by the PGA to move the Tournament to the early fall starting in 2019 and thereafter. This action, prompted by the cancellation of the 2016 Tournament which was necessitated by the Flood, made the Tournament, including related Hotel stays, much less lucrative for Plaintiffs, and in particular for Greenbrier Hotel.

  C. **The Damage To The Club And The Oakhurst Development.**

    1. **The Club.**

24. The Sam Snead Course located on the Club property was partially destroyed by the Flood and remained closed because of the damage for one year. To date, Greenbrier Club has spent over $5 million in rebuilding the Sam Snead Course.

25. The loss of the Sam Snead Course has of course also resulted in lost revenues and has had a detrimental effect on the efforts of the Greenbrier Club and Oakhurst to sell the residential lots and to acquire the related initiation fees and annual dues, all as described above.

### 2. The Oakhurst Development.

26. The ability to market and sell lots at the Oakhurst Development has likewise been nearly eradicated because of the Flood. The construction of the New Oakhurst Course and the ski facility, and the existence of the Sam Snead Course, were key selling points for lots at the Oakhurst Development. Those selling points have now been destroyed, or severely damaged, because of Defendant Insurers' bad faith failure and refusal to pay Plaintiffs' claims related to those Courses and the ski resort.

## D. The Damage To The Golf Courses.

### 1. The Meadows, Greenbrier, Sam Snead, Old Oakhurst and New Oakhurst Courses.

27. The Sam Snead Course and the Meadows Course sustained heavy damage as a result of the Flood. The remediation and restoration costs were in the millions of dollars. The Greenbrier Course, which sustained the least amount of damage, was able to be opened in April 2017, with a limited number of playable holes. Work on the Sam Snead Course was completed, and the course opened in May of 2017, and the Meadows Course, which was completely destroyed and rebuilt was reopened in September 2017. The Old Oakhurst Course was substantially damaged and has yet to be reopened. The losses sustained because of the extensive amounts of time these courses were closed were significant.

28. As described above, development of the New Oakhurst Course, which was commenced prior to the Flood, has now completely ceased, and Plaintiffs continue to suffer damage and losses as a result of that course remaining incomplete.

### 2. The Old White Course.

29. The Old White Course also suffered significant damage as a result of the Flood. The damage was so severe that the Tournament, which is held at the Old White Course, scheduled to take place over the 2016 Fourth of July holiday, had to be cancelled.

30. The Flood resulted in major media coverage, due to the Tournament being cancelled and also because of phone video of the damage to the Hotel, the Club and the Oakhurst Development captured by professional golfer Bubba Watson, who owns property at the Oakhurst Development.

31. Greenbrier Hotel spends millions of dollars every year to host the Tournament. The first two days of the Tournament are televised on the Golf Channel and the weekend rounds are televised nationally on CBS. The exposure received by the Hotel from the Tournament is very significant, and the Tournament is the marquee event for the Hotel from a marketing perspective.

32. Prior to the Tournament scheduled for July 2016, Greenbrier Hotel had paid the required title sponsorship fee to PGA of America in the amount of nearly $10 million. Greenbrier Hotel had also secured $5+ million in sponsorship fees from supporting individuals and businesses for the 2016 Tournament.

33. Following the Flood and the cancellation of the 2016 Tournament, there was significant uncertainty regarding whether the Old White Course could be repaired and ready for the 2017 Tournament. Because of this uncertainty, Greenbrier Hotel was concerned about maintaining its sponsorship base and about its ability to secure revenue for the 2017 and future Tournaments.

34. As a show of good faith and good will, and as a result of these concerns, Greenbrier Hotel allowed the 2016 sponsors who had already paid their sponsorship fees for the 2016 Tournament to "roll over" those fees to the 2017 Tournament.

35. In March and June of 2016, Greenbrier Hotel had paid to the PGA of America the required $9.7 million title sponsorship fee for the 2016 Tournament. Because the Tournament was cancelled, the PGA eventually refunded $3.6 million of this amount, but the remainder – $6.1 million – was not refunded and was not paid to Greenbrier Hotel by Defendant Insurers.

36. Another consequence of the Flood, referenced briefly above, was the change in the date of the Tournament. In 2012, Greenbrier Hotel executed an agreement with PGA of America pursuant to which Greenbrier Hotel would host the Tournament every year through 2021, with annual title sponsorship fees paid by Greenbrier Hotel that increased by 5% each year. Because of the Flood and the failure of Defendant Insurers to meet their obligations under the Policies, Greenbrier Hotel did not have sufficient funds to pay the $10.4 million title sponsorship fee for the 2017 Tournament. Greenbrier Hotel brought this situation to the attention of PGA America, and PGA America agreed that the $10.4 million fee for the 2017 Tournament could be paid in four equal installments, in 2018, 2019, 2020, and 2021, along with the title sponsorship fees for each of those years. In exchange, however, PGA America required Greenbrier Hotel to give up its summer Tournament date and move the Tournament to September. The Tournament will be held in the fall in 2019 and thereafter through 2026.

37. Moving the Tournament to the fall will result in competition for viewership and attendance with collegiate and professional football games played on the same weekend as the

9

Tournament. The Tournament will also lose CBS and all the media coverage from CBS because of the fall date.

38. The financial impact of losing the Fourth of July Tournament dates will be felt by Plaintiffs for years to come and has resulted in damages for lost profits in excess of tens of millions of dollars.

### E. The Policies Of Insurance And The Engagement Of GGG.

39. Plaintiffs had previously procured, through the Resort Hospitality Association and Resort Hotel Insurance Services, property insurance for Plaintiffs' properties. The policies were issued by several domestic and international carriers.

40. After the Flood occurred, and as part of the process of formulating their claims, on or about July 7, 2016, Plaintiffs entered into a Services Agreement with GGG, pursuant to which, among other things, Plaintiffs, as Insured, engaged GGG, as Adjuster, to:

> assist the Insured and to act on his behalf in the adjustment of his claims against the insurance companies involved, arising from the loss and/or damage by Physical Damage to Buildings, Land Improvements, Business Personal Property, Golf Courses, Business Income/Extra Expense which occurred at The Greenbrier, 300 West Main Street, White Sulphur Springs, West Virginia, 24986, 5 Kates Mountain Road, White Sulphur Springs, West Virginia, 24986, and Associated Addresses and occurred during June of 2016, and continuing.

*See* Services Agreement, a copy of which is attached as ***Exhibit A***, p. 1.

41. The Services Agreement authorized GGG to "prepare all necessary estimates, inventories and other applicable and/or required instruments to comply with the provisions of the subject insurance policies." *See id.*

42. The Services Agreement provided a fee schedule that was based on the amount of recoveries obtained by Plaintiffs, starting at 2% and increasing to 8%, with each increase

including all previous percentages. In summary, recoveries up to $10 million resulted in a 2% fee to GGG. For a recovery between $10 million and $20 million, the fee would be 2% of the $10 million plus 4% of the amount between $10 and $20 million, and so on, up to 8% for recoveries above $50 million. *See id.*

43. The Services Agreement imposed on GGG the duty to perform its services "in a diligent, competent and professional manner consistent with the quality of services for those similarly situated to Insured in accordance with generally accepted industry standards." *See id.*, p. 2.

44. The services that GGG committed to provide were set forth in a Scope of Services that was incorporated into the Services Agreement. A copy of the Scope of Services is attached as ***Exhibit B***.

**F.    The Substandard Work And The Termination Of The Services Agreement**

45. In or around November or December 2017, Plaintiffs terminated the services of GGG for cause because GGG had failed to meet its obligations under the Services Agreement and had not performed the services promised in the Scope of Services.

46. By way of example, but not limitation:

   a.   GGG failed to properly calculate Plaintiffs' business interruption losses, and refused to correct and revise those calculations despite Plaintiffs' demands that it do so;

   b.   GGG made little to no effort to advance the progress of the claims adjustment process and failed and refused to put pressure on the insurers to respond to and settle the claims;

c. GGG failed to include claims for the ski resort and for the lost home sales in its demands to the insurers;

d. GGG brought in an engineering company with which, upon information and belief, it had an affiliation, and this company did not include in its repair estimates the fact that the Greenbrier Hotel is an historic landmark that had been furnished with specially created and installed interior décor and furnishings; when Plaintiffs demanded that GGG's chosen engineering firm review and reconsider its estimate to include the value that the historic landmark status added to the property, and to include the value of the specialty furniture and décor that had been damaged or destroyed, GGG refused to do so. Plaintiffs then retained another consultant who prepared revised estimates that considered such special interior décor and furniture as well as the historical and architectural landmark status of the Greenbrier Hotel and Plaintiffs submitted and relied upon this revised estimate thereby rejecting the use of GGG's affiliate;

e. GGG failed and refused to include a sufficient claim for the loss of the US Open golf tournament occasioned by the flood;

f. When representatives of Plaintiffs demanded in September 2017 that GGG file suit against the insurers because of their refusal to negotiate and settle the claims, GGG refused to do so; and

g. GGG failed in numerous other aspects of its engagement to provide the required competent and capable work expected of it by Plaintiffs and failed to meet industry standards as to its work.

47. The recoveries obtained by Plaintiffs, with the assistance of GGG and others before its termination for cause, albeit with extreme pressure and assistance from Plaintiffs, totaled approximately $39 million. This was a completely inadequate result, and GGG received compensation, which constituted an over-payment to GGG. After payment of what was purportedly due to GGG as of that date, $609,515.26 was in dispute between GGG and Plaintiffs and was placed in escrow being held by the RHA. It is Plaintiffs' position that GGG has to date been overcompensated given the poor quality of its work and that GGG is entitled to no portion of the funds presently held in escrow.

### G. The Escrow Agreement

48. When Plaintiffs terminated GGG they brought in BDO to attempt to negotiate and resolve the remaining claims. Because the work performed my GGG to that point was of such substandard quality, BDO was required to completely start over, creating new and more accurate claim documents, estimates, and demands.

49. BDO and Plaintiffs' counsel, have continued to pursue recovering claims against both domestic and international insurers. Despite being overpaid, having been terminated for cause and having no legitimate right to receive any part of funds that would be obtained after their termination for cause, GGG has continued to wrongfully assert that it is entitled to additional fees based on any recoveries obtained after GGG's services were terminated.

13

50. In order to address GGG's claims and to allow the negotiation and claims settlement process to continue, on March 27, 2018, Greenbrier Hotel and GGG entered into that certain Agreement Between The Greenbrier And The Goodman-Gable-Gould Company (the "Escrow Agreement"). A copy of the Escrow Agreement is attached as ***Exhibit C***.

51. The amount currently in dispute between GGG and Plaintiffs is $609,515.26. Pursuant to the Escrow Agreement, the Resort Hotel Association has placed those funds into an escrow account. The Escrow Agreement provides that the funds be held "at a bank or other financial institution based in Washington, DC" under the names of Greenbrier Hotel and GGG. *See* Escrow Agreement, p. 1.

52. RHA has caused the disputed funds to be paid into an escrow account held in Richmond, Virginia.

53. GGG has refused to release its claims to the disputed funds, and Plaintiffs assert that GGG is not entitled to any part of the disputed funds or to receive any part of any additional funds obtained by Plaintiffs arising out of the 2016 flood. A real and justiciable controversy therefore exists as to the amount, if any, of the disputed funds to which GGG is entitled.

## COUNT I
### (Declaratory Judgment)

54. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 53 of this Complaint as if fully set forth herein.

55. GGG's work under the Services Agreement was substandard, resulted in an inadequate recovery by Plaintiffs in light of the losses they suffered because of the flood and brought about GGG's termination for cause.

56. Despite GGG's failure to meet its obligations under the Services Agreement, and in an effort to avoid conflict with GGG while they were continuing to negotiate their remaining claims against the insurers through BDO, Plaintiffs paid GGG the fees to which GGG claimed it was entitled for the approximately $39 million recovery.

57. GGG has nevertheless wrongfully claimed that it is entitled to additional fees for any recoveries obtained through the efforts of BDO and Plaintiffs' counsel long after GGG was terminated.

58. The parties have attempted to resolve their differences with respect to the disputed funds, but have been unsuccessful in doing so, with GGG claiming it is entitled to the full amount of the disputed funds, and more, and Plaintiffs asserting that GGG has been paid more than was required for the services it performed.

59. A real and justiciable controversy therefore exists as to the amount of the disputed funds, if any, to which GGG is entitled and the amount of additional fees, if any, that GGG is entitled to for any recoveries obtained by Plaintiffs through the efforts of BDO, Plaintiffs and others.

60. Plaintiffs are therefore entitled to a Declaratory Judgment declaring that GGG is not entitled to any additional payments related to Plaintiffs' flood claims beyond the amounts already paid to GGG, including that GGG has no right to any portion of the disputed funds held in escrow by RHA.

# COUNT II
## (Breach Of Contract)

61. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62. Pursuant to the Services Agreement and the incorporated Scope of Services, GGG was obligated to perform its services in adjusting and settling Plaintiffs' insurance claims related to the flood "in a diligent, competent and profession manner consistent with the quality of the services for those similarly situated to Insured in accordance with generally accepted industry standards."

63. GGG failed to meet those standards, and thereby breached the Services Agreement, by, among other things,

    a. Failing to properly calculate Plaintiffs' business interruption losses, and refusing to correct and revise those calculations despite Plaintiffs' demands that it do so;

    b. Making little to no effort to advance the progress of the claims adjustment process and failing and refusing to put pressure on the insurers to respond to and settle the claims;

    c. Failing and refusing to include claims for the ski resort and for the lost home sales in its demands to the insurers;

    d. Bringing in an engineering company with which, upon information and belief, it had an affiliation, and refusing Plaintiffs' demands that GGG's chosen engineering firm review and reconsider its estimate to include the value that the historic and architectural landmark status added to the

16

property, and to include the value of the specialty furniture and interior décor that had been damaged or destroyed, as well as the historical and architectural landmark status of the Greenbrier Hotel, causing Plaintiffs to retain additional consultants to do the work needed to support the architectural and historical value of the Greenbrier Hotel, its interior décor and furniture;

e. Failing and refusing to include a sufficient claim for the loss of the US Open golf tournament occasioned by the flood;

f. Refusing Plaintiffs' demand in September 2017 to file suit against the insurers because of their refusal to negotiate and settle the claims; and

g. Failing generally in numerous other aspects of its engagement to provide the required completed and capable work expected of it by Plaintiffs and failed to meet industry standards as to its work.

64. GGG was paid far more that it had rightfully earned under the Services Agreement because of these breaches of the Services Agreement and is not entitled to obtain any portion of the funds now held in escrow.

65. Through these actions and omissions, GGG materially breached the Services Agreement. As a direct and proximate cause of these breaches of the Policies, Plaintiffs have suffered damage.

66. Plaintiffs are therefore entitled to recover compensatory damages from GGG arising from its breach of the Services Agreement, the exact amount of which will be determined at trial in an amount in excess of the diversity jurisdiction requirements of 28 U.S.C. § 1332.

## COUNT III
### (Breach Of Implied Covenant Of Good Faith, Honesty And Fair Dealing)

67. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68. At all times relevant herein, and since at least July 7, 2017, when the Services Agreement was entered into between Plaintiffs and GGG, there was imposed upon GGG an implied covenant of good faith, honesty and fair dealing in favor of Plaintiffs.

69. This implied covenant of good faith, honesty and fair dealing required that GGG act in the best interest of Plaintiffs in adjusting and settling Plaintiffs' claims, and that it do so in a profession manner consistent with generally accepted industry standards.

70. GGG breached this implied covenant of good faith, honesty and fair dealing by and through its wrongful, bad faith actions and omissions, including those set forth in Paragraph 63, *supra*.

71. As a direct and proximate result of GGG's breaches of the implied covenant of good faith, honesty and fair dealing, Plaintiffs have suffered and will continue to suffer financial losses and losses to their prospective business advantages, and GGG has wrongfully benefitted.

72. Plaintiffs are therefore entitled to recover compensatory damages from GGG arising from its breaches of the implied covenant of good faith, honesty and fair dealing, the exact amount of which will be determined at trial in an amount in excess of the diversity jurisdiction requirements set forth in 28 U.S.C. § 1332.

WHEREFORE, Plaintiffs respectfully request Judgment on their Complaint herein as follows:

A. A Declaratory Judgment pursuant to 28 U.S.C. §2201(a) on Count I declaring that GGG is not entitled to any additional payments related to Plaintiffs' flood claims beyond the amounts already paid to GGG, including that GGG has no right to any portion of the disputed funds held in escrow by RHA;

B. A Judgment on Count II for compensatory damages against GGG for breach of contract;

C. A Judgment on Count III for compensatory damages against GGG for breach of the implied duty of good faith, honesty and fair dealing;

D. A docket preference expediting these proceedings in accordance with Rule 57 of the Federal Rules of Civil Procedure;

E. A reasonable attorney's fee;

F. Trial by jury on all counts so triable; and

G. Such further relief as Plaintiffs appear entitled, in addition to the costs and disbursements of this action.

Respectfully submitted,

/s/ Aaron B. Houchens

---

AARON B. HOUCHENS (VSB #80489)

AARON B. HOUCHENS, P.C.
111 East Main Street
P.O. Box 1250
Salem, Virginia 24153
Telephone: (540) 389-4498
Facsimile: (540) 339-3903
aaron@houchenslaw.com

and


RICHARD A. GETTY
(*Pro Hac Vice* Admission forthcoming)
 and
DANIELLE HARLAN
(*Pro Hac Vice* Admission forthcoming)

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507
Telephone: (859) 259-1900
Facsimile: (859) 259-1909
rgetty@gettylawgroup.com
dharlan@gettylawgroup.com

COUNSEL FOR PLAINTIFFS,
GREENBRIER HOTEL CORPORATION,
THE GREENBRIER SPORTING CLUB,
INC., GREENBRIER SPORTING CLUB
DEVELOPMENT COMPANY, INC., OLD
WHITE CHARITIES, INC., AND
OAKHURST CLUB LLC

dhbpld2733